IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 8, 2010 Session

## CATHY L. CHAPMAN, ET AL. v. JAMES V. LEWIS, M.D., ET AL.

**Appeal from the Law Court for Sullivan County**
**Nos. C34112(L) and C36405(L)      E. G. Moody, Chancellor**

**No. E2009-01496-COA-R9-CV - FILED JULY 28, 2010**

On April 10, 2000, William D. Chapman, II ("the Deceased") was involved in a motor vehicle accident. As a result of his injuries, he was admitted to Holston Valley Hospital and Medical Center in Kingsport where he came under the care of trauma surgeons, the defendants, James V. Lewis, M.D., and George M. Testerman, Jr., M.D., as well as other physicians and medical personnel. The plaintiff, Cathy L. Chapman, brought this wrongful death action against the defendants based upon her allegation that they were guilty of medical malpractice in the treatment of her husband; she claims that their malpractice caused the death of the Deceased on April 15, 2000. Following eight days of a jury trial in July 2008, counsel for the parties made their closing arguments. During the defense's argument, counsel for the plaintiff objected when counsel for Dr. Testerman projected on a video screen what purported to be the Q. and A. trial testimony of the plaintiff's medical expert, Dr. Philip Witorsch. The trial court overruled the objection and thereafter the jury returned a verdict in favor of both defendants. Later, the trial court, acting on the plaintiff's motion, reversed itself and held that the defendants failed to lay a proper foundation for the use of the projected testimony. The court also pointed out that the defendants failed to give the plaintiff prior notice of their intention to use portions of the trial transcript in closing argument. As a consequence, the court granted the plaintiff a new trial. The defendants appeal. We reverse the trial court's grant of a new trial and reinstate the court's judgment in favor of the defendants.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Law Court
Reversed; Judgment for Defendants Reinstated; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Charles T. Herndon, IV, Johnson City, Tennessee, for the appellant, James V. Lewis, M.D.

Jeffrey M. Ward, Greeneville, Tennessee, for the appellant, George M. Testerman, Jr., M.D.

Richard L. Duncan, Knoxville, Tennessee, and John Bandeian, Bristol, Tennessee, for the appellee, Cathy L. Chapman.

**OPINION**

I.

During closing argument, both sides used a "power point" presentation by projecting material on a video screen using what is known as an "electronic visual evidence projector."[1] Without objection, one of the plaintiff's attorneys during his opening argument projected exhibits introduced at trial, *i.e.*, the autopsy report and a gastric drug screen, as well as script representing his recollection of portions of the trial testimony of various medical witnesses. In his presentation, counsel did not utilize and project any of the verbatim Q. and A. trial testimony.

When Mr. Ward, attorney for Dr. George M. Testerman, Jr., made his closing argument, he also chose to project material on the video screen; but his approach was different from that of the plaintiff's counsel. Instead of projecting his memory of the testimony, he projected what purports to be the actual Q. and A. of a witness at trial – the plaintiff's medical expert, Dr. Witorsch.

On appeal, the defendants did not identify and preserve for the record the transcript pages of Dr. Witorsch's trial testimony that Mr. Ward projected on the screen during his closing argument; not did the plaintiff. For the benefit of the reader of this opinion, we have excerpted those portions of Mr. Ward's closing argument in which he verbalized specific questions posed to, and answers from, Dr. Witorsch. Apparently, he was reading to the jury what was projected on the screen. We also have included other short portions of Mr. Ward's argument in order to put the challenged portion in context. The excerpted portions of his argument are as follows:

> I submit to you that all the testimony is being recorded. All of it's here. If [counsel for the plaintiff] wanted to bring you something up that was so critical, so crucial to your decision from Dr. Enderson, he could have brought it up here and put it right here on the screen and said, "There it is. There's where Dr. Enderson said that Dr. Testerman or Dr. Lewis breached the

---

[1]The source of the name of the device is the defendants' brief.

standard of care. There it is right there." That's not what he's done. What he's done is tell you what he says that testimony was.

But let's look at what the actual proof is . . .

\* \* \*

When we're talking about Dr. Testerman and what Dr. Testerman did and didn't do, you've got to decide whether his actions breached the standard of care. The only person that has come in here and told you that something Dr. Testerman did wrong, that was a breach of the standard of care – the only person who has said that is Dr. Witorsch.

And if we start talking about Dr. Witorsch, we can talk a long time, but there are some things that I think are extremely important. Dr. Witorsch is not a trauma surgeon, not a surgeon of any type. He doesn't treat trauma patients. In fact, he was asked the question, "In fact, you've never been the primary physician to take care of trauma patients? Answer: That's correct. Question: The clinic that you talked about that you worked in, you didn't take care of trauma patients in that clinic, did you? Correct. I did not." Had no training as a trauma surgeon, no experience as a trauma surgeon, although he told you that some pulmonologists have critical care expertise, he doesn't.

\* \* \*

The only person saying there's a deviation from the standard of care is Dr. Witorsch. And again, let's look at what Dr. Witorsch's knowledge of the standard was for Kingsport. He was asked the question, "Well, isn't it true that when you were deposed on that case that you didn't even know that Kingsport was part of the Tri-Cities? I don't recall. So as of 2003 you can't say whether you knew anything about Kingsport or not, can you? I can't." Although Dr. Witorsch admitted that he's not a trauma surgeon, admitted that he's not a cardiologist, admitted he's not a pathologist, admitted he's not an expert with

-3-

respect to SUV's, admitted he's not even a[] life expectancy expert, he came in here and offered opinions on all of those issues. My question when he said, "Question: You've also offered opinions that relate to cardiologist issues, haven't you? Yes. You offered opinions related to neurosurgery issues, haven't you? Roughly, yes. You've offered opinions relating to pathology issues, haven't you? I guess, yes. And you've offered opinions relating to life expectancy issues, haven't you? Yes. You've even offered opinions relating to SUV's and the effect of SUV's on patients' injuries in roll-over accidents, haven't you? That wasn't an opinion to a reasonable degree of medical certainty, but, yes. My question was, but it was one that you were willing to give to the jury anyway, wasn't it? Answer: I was asked a question. I answered it yes. And, in fact, you're obviously not a cardiologist? Correct. You're not a neurosurgeon, are you? Correct. You're not a trauma surgeon, are you? Correct. You're not a pathologist, are you? Correct.

MR. DUNCAN: If your Honor – can we approach?

 [Discussion at Bench Conference Outside Hearing of Jury]

THE COURT: Yes, Sir.

MR. DUNCAN: Your Honor, this is the transcript of the trial which appears to be improper and to put it up on the screen.

MR. WARD: Your Honor, the plaintiffs were showing portions of depositions that were used at trial.

MR. DUNCAN: No, they were used at trial and there was no objection made. You're using something that was not . . .

MR. WARD: This is Dr. Witorsch's actual testimony that he didn't want the jury to see.

MR. DUNCAN: Your Honor, we haven't seen a copy of that. There's no – if this is the transcript of this trial, it's improper to use that. Now if he wants to say this is what he said, that's fine.

-4-

MR. WARD: This is the information that was available to both sides. Either side could have obtained it. Dr. Enderson's testimony could have been transcribed and used. I'm not doing anything that they didn't do. And if it was improper, why did they do it?

MR. DUNCAN: Your Honor, excuse me. You handled this same issue. You said if it was certified. [Footnote added.]

THE COURT: Every case is different. I'm not sure you can do it without laying a foundation.[2] How much more do you have to go?

MR. WARD: Quite a bit of Dr. Witorsch.

THE COURT: I'm going to overrule the objection.

[Bench Conference Concluded]

MR. WARD: In discussing all of that Dr. Witorsch also acknowledged, and the question was, "And you don't have any specific expertise in life expectancy different than any other

---

[2]John Bandeian explained this comment in his affidavit filed in the trial court:

My name is John Bandeian. I am more than eighteen years of age and I am competent to make this affidavit. I represent the plaintiff, Cathy Chapman in this action.

In a medical malpractice suit I tried before Chancellor Moody in November 2007, [he] ruled that I could not project for the jury a transcript of actual trial testimony during my closing argument.

Page 62 of the transcript of the closing argument in the case at bar contains an omission. On line 21, the Court said "Every case is different. I'm not sure you can do it without laying a foundation." The Court's remark about each case being different was in response to my argument that this same Court ruled I could not project a transcript of actual trial testimony during my closing in the Jackson case, he tried last November. My words were not recorded by the court reporter.

(Paragraph numbering omitted.)

person might have that reads articles on the aortic valves? Correct. I think carrying on from there, so when we're talking about trauma surgeons practicing in Kingsport and similar communities, you would acknowledge that you never practiced medicine in Tennessee? Correct. Never been licensed in Tennessee? Correct. Never been through an internship or residency in trauma surgery, have you? Correct. Never been through any type of internship or residency in surgery, period? Correct. You don't have any special training related to trauma surgery, do you? Correct.

* * *

We look at Dr. Witorsch's actual opinions and you've heard a lot about different opinions. You've heard a lot about different things that could or couldn't be done, but let me focus right now on Dr. Testerman's involvement. Dr. Testerman was involved in three days, the 11th, the 13th and the evening of the 15th. "Dr. Witorsch ultimately agreed, now on the 11th you've already told the jury no deviation from the standard of care by Dr. Testerman on the 11th? Correct. You talked a lot about the 13th. You talked about whether to use Coumadin, whether to use heparin. Ultimately, Dr. Witorsch agreed. No breach by Dr. Testerman on the 11th. We talked about the 13th. No breach by Dr. Testerman on the 13th? Correct."

But on the evening of the 15th, there was no evidence in the record, no sign or symptom indicated by anyone that this patient had a clotting problem that required Heparin. And that's the only criticism about anticoagulation by Dr. Witorsch relating to Dr. Testerman, and nobody else agreed with that thought or theory. The only other thing that Dr. Witorsch was saying on the evening of the 15th relates to the Lopressor. And again, when we talk about the Lopressor this was the added theory that Dr. Witorsch added to his list of theories after he decided that the record was inaccurate on the initial Code rhythm. It was initially his opinion and he was asked – at the time of his earlier testimony, "You told us, Sir, in your professional opinion that this patient had died of asystole, correct? Answer: Correct. And that was perfectly consistent with the record, the medical records

in this case? Answer: It was. All right. And if that be true, Metoprolol had nothing to do with it? If that was the case that would have been true."

As previously noted, the jury returned a verdict for the defendants. The trial court entered its judgment on the jury's verdict. The plaintiff filed a motion for a new trial and later a motion to alter or amend. Prompted by the former motion, the trial court, on November 10, 2008, entered an order granting the plaintiff a new trial. Thereafter, acting on the plaintiff's motion to alter or amend, the court, by "Amended Order" entered March 13, 2009, amended its order granting a new trial by adding the following language to the earlier order:

> The Court erred in overruling the objection of the Plaintiff to defense counsel's projecting some of the trial testimony to the jury, during final argument, on the ground that defense counsel failed to lay a proper foundation and on the ground that the Court's overruling the Plaintiff's objection allowed defense counsel to take trial testimony out of context without allowing the Plaintiff to make a timely response since the Plaintiff was not notified in advance that defense counsel was going to project the trial testimony and since the trial testimony was seven days long.

Thereafter, the trial court granted the defendants an interlocutory appeal pursuant to the provisions of Tenn. R. App. P. 9. We also granted the defendants' Tenn. R. App. P. 9 application.[3]

II.

The one issue presented by the defendant presents the following question for our resolution:

_____

[3]We granted the application after the trial court, in response to the plaintiff's motion to clarify filed in that court, confirmed that his new trial grant was based solely on the closing argument "error." The trial court expressly stated its approval of the jury's verdict in its role as the 13th juror:

> When initially reviewing the Motion for New Trial, the Court made an independent review of the evidence and weighed the evidence. The Court did not find that the weight of the evidence preponderated against the jury's verdict. Thus, in its role as the Thirteenth Juror, the Court approved of the jury's verdict.

Did the trial court err when it granted a new trial on the basis that the court improperly allowed defense counsel to project portions of trial testimony during closing argument without establishing a proper foundation or providing prior notice to the plaintiff?

Simply put, the plaintiff argues that if a party chooses to project actual trial testimony on a video screen during that party's closing argument to the jury, it must first advise the other party as to the portions of the testimony it intends to use.

III.

After the trial in the present case, a panel of this Court addressed the precise issue now before us. *See* ***Stanfield v. Neblett***, No. W2009-01891-COA-R3-CV, 2010 WL 2219660 (Tenn. Ct. App. W.S. filed July 23, 2010). ***Stanfield*** is also a medical malpractice case. It involves the use of an unauthenticated transcript under virtually identical circumstances as those in the instant case. As in the present case, the plaintiff in ***Stanfield*** objected when defense counsel during her closing remarks sought to project onto a screen a portion of the yet-to-be certified transcript. The trial court overruled the objection and counsel continued her presentation.

On appeal, the ***Stanfield*** Court first noted the standard of review applicable to questions concerning closing arguments:

> Closing argument is a crucial component of any jury trial. ***McCrory v. Tribble***, No. W2009-00792-COA-R3-CV, 2010 Tenn. App. LEXIS 282, 2010 WL 1610857, * 6 (Tenn. Ct. App. April 22, 2010). Closing arguments allow counsel to present their theory of the case and to point out strengths and weaknesses in the evidence. [C]ounsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. ***Anderson v. State***, No. E2008-00439-CCA-R3-PC, 2009 Tenn. Crim. App. LEXIS 657, 2009 WL 2474673, *6 (Tenn. Crim App. Aug. 13, 2009). As with all other arguments by counsel, this Court reviews the trial court's decisions on closing arguments under an abuse of discretion standard. ***Perkins v. Sadler***, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991).

*Id*. at * 16.

In *Stanfield*, the plaintiff first generally asserted that "counsel should not be allowed to display unauthenticated portions of the trial transcript to the jury during closing arguments." *Id*. This Court disagreed, noting that the plaintiff had presented no authority in support of her position and the court had found none. *Id*. Moreover, although the plaintiff correctly argued that a party may not use inadmissible evidence during its closing argument, we observed that "there is no indication in the record that the testimony presented by [defense] counsel was inadmissible testimony." *Id*. The same is true in the present case.

In concluding that the trial court did not err in allowing counsel to display portions of the unofficial trial transcript during closing argument, the *Stanfield* Court stated:

> It is well established that there is nothing wrong with reminding the jury of the testimony of various witnesses in closing argument. *Perkins v. Sadler*, 826 S.W.2d at 442. "[C]ertainly in closing argument one can properly utilize a summation of trial testimony, and it should not be improper for this to be done in a question [and] answer form." *Id*. This is exactly what [defense counsel] was attempting to accomplish. She displayed portions of the trial transcript to the jury in order to remind them of the testimony given. She chose portions of the testimony to emphasize the strengths of [the defendant's] theory of the case, and the weaknesses of [the plaintiff's] theory. Counsel for [the plaintiff] similarly reminded the jury of certain portions of the testimony given in his closing argument and rebuttal for the same purpose. He, however, chose not to display the portions of the testimony that he viewed as important to his case and argument. We have found no authority to indicate that counsel should not be able to display portions of the transcript to the jury during closing arguments. In fact, Tennessee Code Annotated § 20-9-303 provides:
>
>> In the trial of any civil suit, counsel for either party shall be permitted to use a blackboard, model or similar device, also any picture, plat or exhibit introduced in evidence, in connection with counsel's argument to the jury for the purposes of illustrating the counsel's contentions with respect to the issues that are to be decided by the jury, provided, that counsel shall not, in writing,

present any argument that could not be properly
made orally.

*Stanfield*, 2010 WL 2219660 at *16-17. We concluded in *Stanfield* that defense counsel's use of the transcript fell within the realm of permissible argument: "Counsel . . . was acting within the provisions of this statute. She displayed portions of the trial transcript in order to make the same arguments she would have been allowed to make orally." *Id*. at * 17.

Lastly, the *Stanfield* Court considered the plaintiff's argument that it was impossible to know whether the portion of the transcript displayed for the jury was accurate because, as in the present case, there was no showing that the transcript had been authenticated or certified by the court reporter. Based on the appellate record in *Stanfield*, we could not discern what was shown to the jury versus what was orally stated by counsel. Nonetheless, absent any showing that the plaintiff was prejudiced as a result of an inaccurate or unauthenticated transcript, the *Stanfield* Court concluded that there was no abuse of discretion in permitting counsel's use of the transcript in her summation:

> Both sides concede that what was displayed was obtained directly from the court reporter. Moreover, counsel for [the plaintiff] was present when portions of the transcript were displayed to the jury. At no point did he object to what was being displayed or indicate on the record that he believed the transcript was inaccurate. Further, Rule 6 of the Court of Appeals requires [the plaintiff] to provide citations to the record as to where an alleged prejudice is recorded. [The plaintiff's] brief provides no such citations to support her argument that the transcript shown was inaccurate or that she was prejudiced because the transcript had not yet been certified. Accordingly, we cannot find that she was prejudiced by [the defendant's] use of portions of the transcript during his counsel's closing argument.

*Id*. Similarly, in the present case, the plaintiff at trial essentially objected to the *method* by which defense counsel sought to present his closing argument. The plaintiff, however, has not been able to show that the testimony displayed to the jury was less than fully accurate.

In our view, the reasoning employed by the *Stanfield* Court is sound and is applicable to the present case. Obviously, the trial court did not have the benefit of the *Stanfield* decision when it considered the plaintiff's arguments on her post-trial motions and thereafter reversed its earlier ruling. In short, however, we think that the trial court "got it right" at trial

when it permitted the use of the transcript during defense counsel's closing argument. We find pertinent our concluding remarks in **Stanfield** regarding this issue:

> Closing arguments are a tool used by counsel to summarize their theory of the case, to remind the jury of the evidence supporting their theory, and also to point out weaknesses in the opposing counsel's argument. Often when doing so, counsel will remind the jury of a portion of a witness' testimony that favors their case and not point out testimony that favors the opposing party. Opposing counsel has the opportunity in his or her closing argument or rebuttal to point out testimony that was not mentioned and make his or her argument accordingly. The fact that the testimony was displayed instead of merely read or paraphrased does not change what counsel is allowed to state in closing arguments.

*Id*.

In the case before us, the plaintiff has not argued, demonstrated, or even alleged that the Q. and A. transcript was not the testimony of Dr. Witorsch given during this eight-day trial nor has she argued, demonstrated or alleged that the projected testimony was not accurate. Under these circumstances, we do not find any error in defense counsel's use of the projected testimony at trial. Accordingly, we conclude that the trial court abused its discretion when it ruled to the contrary and granted the plaintiff's post-trial motions.

We firmly believe, following the lead of **Stanfield**, that the trial court erred when it granted a new trial based upon its conclusion that it was improper to use Q. and A. trial testimony in closing argument without laying a proper foundation or giving prior notice to adversary counsel of counsel's intention to do so. However, assuming, for the purpose of argument, that the trial court was correct in its holding that defense counsel's use of the Q. and A. trial testimony was improper, we do not believe that this particular part of his argument was such as to be an "error involving a substantial right [that] more probably than not affected the judgment." Tenn. R. App. P. 36(b). In other words, considering the record as a whole, any such error would be harmless and not warrant the granting of a new trial.

IV.

The judgment of the trial court granting the plaintiff a new trial is hereby reversed and the judgment of the trial court in favor of the defendants based upon the jury's verdict is hereby reinstated. Costs on appeal are taxed to the appellee, Cathy L. Chapman. Case

remanded to the trial court, pursuant to applicable law, for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE